FILED

2017 Apr-20  AM 10:13
U.S. DISTRICT COURT
N.D. OF ALABAMA



## IN THE UNITED STATES DISTRICT COURT FOR THE
## NORTHERN DISTRICT OF ALABAMA, SOUTHERN DIVISION

| | |
|---|---|
| Charles JACKSON | ) |
| | ) Jury Trial Requested |
| Plaintiff | ) |
| | ) |
| v. | ) Case No. _____ |
| | ) |
| WAL-MART STORES INC. | ) |
| WAL-MART STORES EAST L.P. | ) |

No.1, whether singular or plural, the person or entity that designed, manufactured, tested, marketed, distributed, and/or sold the defective Blitz gas container made the basis of this suit

No.2, whether singular or plural, the person or entity whose negligence, wantonness, breach of implied warranty, and/or strict liability caused Mr. Jackson's burn injuries

| | |
|---|---|
| | ) |
| Defendants | ) |

## COMPLAINT

Comes now the Plaintiff, Charles Jackson, who alleges the following facts, asserts the following causes of action, and seeks the following damages against the Defendants: Wal-Mart Stores Inc., Wal-Mart Stores East L.P., and Fictitious Defendant No.1 and No.2.

### Parties, Jurisdiction, and Venue

1. This is a personal injury product liability case to recover compensatory and punitive damages for Jackson's severe burn injuries. The case is brought pursuant to this Court's diversity jurisdiction and under Alabama substantive law.

2. Jackson is a competent, adult resident citizen of Shelby County, Alabama.

3. Defendant Wal-Mart Stores Inc. is a corporation that was created pursuant to the laws of the State of Delaware that has its principal place of business in the State of Arkansas. It does substantial, continuous, and systematic business in the State of Alabama, including Shelby County, and it is registered to do business in the State of Alabama with the Alabama Secretary of State. Its registered agent for service is the C.T. Corporation System, which can be served at 2 North Jackson Street, Suite 605, in Montgomery, Alabama 36104.

4. Defendant Wal-Mart Stores East L.P. is a limited partnership created pursuant to the laws of the State of Delaware that has its principal place of business in the State of Arkansas. It does substantial, continuous, and systematic business in the State of Alabama, including Shelby County, and it is registered to do business in the State of Alabama with the Alabama Secretary of State. Its registered agent for service is the C.T. Corporation System, which can be served at 2 North Jackson Street, Suite 605, in Montgomery, Alabama 36104.

5. Upon information and belief, the sole general partner of Wal-Mart Stores East L.P. is WSE Management L.L.C. and the sole limited partner is WSE Investment L.L.C. Upon information and belief, both of these limited liability companies were created pursuant to the laws of the State of Arkansas, and the sole member of both of these limited liability companies is Wal-Mart Stores East L.L.C. Upon information

and belief, the sole member of Wal-Mart Stores East L.L.C. is Wal-Mart Stores Inc.

6. Jackson seeks more than $75,000.00 in damages, exclusive of interests and costs. Because there is complete diversity of citizenship between Jackson and Defendants Wal-Mart Stores Inc. and Wal-Mart Stores East L.P., this Court has diversity jurisdiction over this action pursuant to 28 U.S.C. § 1332(a)(1).

7. Defendants Wal-Mart Stores Inc. and Wal-Mart Stores East L.P. are collectively referred to herein as "Wal-Mart."

8. Wal-Mart has submitted to the in personam jurisdiction of Alabama courts, including this Honorable Court, by its/their registration to do business in Alabama with the Alabama Secretary of State. In addition, Wal-Mart owns stores, employs workers, and sells its products in Alabama from its Alabama stores and by and through its internet sales to Alabama. Wal-Mart derives substantial revenue from its products sold and/or used in Alabama. Accordingly, Wal-Mart should and/or does reasonably expect that its business activities can and/or will have consequences within the State of Alabama.

9. Fictitious Defendant No.1, whether singular or plural, whether singular or plural, is/are the person(s)/entity(ies) that designed, manufactured, tested, marketed, distributed, and/or sold the defective gas container made the basis of this suit.

10. Fictitious Defendant No.2, whether singular or plural, is whether singular or plural, is/are the person(s)/entity(ies) whose negligence, wantonness, breach of

implied warranty, and/or strict liability caused Mr. Jackson's burn injuries.

11. The identities of Fictitious Party Defendants No.1 and No.2 are unknown. Their true names will be substituted by amendment when they are ascertained.

12. Venue is proper in the United States District Court for the Northern District of Alabama, Southern Division, pursuant to 28 U.S.C. § 1391(b)(2), because a substantial part of the events giving rise to the claims at issue, particularly the explosion that injured Jackson, occurred within this district and division.

<u>Factual Allegations</u>

13. Blitz was the nation's largest manufacturer of plastic gas containers for consumer use for many years.

14. For decades prior to the incident made the basis of this suit, Wal-Mart and No.1 and No.2 were engaged in the business of marketing, distributing, and selling gas containers to consumers within the stream of commerce.

15. A flame arrestor (a/k/a flame arresting screen, flash arrestor and/or spark arrestor) is a small, inexpensive metal device placed at the opening of a gas container's outlet. It allows gasoline to flow out of the nozzle, but it prevents potential flames from traveling back into the gas container. The device consists of either a perforated metal disk or a wire mesh screen. The arrestor prevents a flame from entering the container by absorbing and dispersing its heat energy.

16. Flame arrestors are not new technology; the operating principle of the

device was discovered more than 200 years ago. For decades, gas container manufacturers have known of the existence and safety value of flame arrestors, and they have included them in the design of gas containers for decades. In the 1970s, flame arrestors began being incorporated into gas containers marketed to the general public.

17. Moreover, for more than a quarter century, the utility and efficacy of flame arrestors have been a topic of discussion in the media and national publications, as well as the subject of numerous lawsuits filed by consumers, users and bystanders that have been burned and/or killed in encounters with gas containers that were not equipped with the device.

18. Wal-Mart is the nation's largest seller of plastic gas containers. Consequently, Wal-Mart and No.1 and No.2 had actual subjective knowledge for decades prior to the subject incident that other gas container manufacturers had incorporated flame arrestors into the design of the gas containers they produced. For decades prior to the subject incident, Wal-Mart and No.1 and No.2 had actual subjective knowledge for decades prior to the subject incident that gas containers without flame arrestors were susceptible to flashback explosions, which occur when gasoline vapors outside of a gas container connect with a flame or heat source, ignite and follow the vapor trail back into the gas container, causing it to explode and/or spew flames from burning gasoline.

19. Wal-Mart had subjective actual knowledge of explosion incidents from lack of arrestors through its involvement in lawsuits involving Blitz containers since 2005. It had this knowledge almost a decade before through its involvement in lawsuits involving another manufacturer, Rubbermaid, back in the early 1990s.

20. An internal corporate video from a company meeting in 2003 posted on YouTube by a communications company shows a Wal-Mart official making a joke about a gas container exploding. In the video, a Wal-Mart employee wearing a helmet and sunglasses drives what appears to be a motorized scooter down a store aisle and into a display of the red portable plastic gas containers, marked with a sign that reads "2 for $9.00." A chorus of shouted "whoas!" can be heard in the background as some of the containers fall to the ground. The camera cuts to three officials on a stage, one of whom asks, "Whose gas can was that?" Another chimes in, "It's a great gas can -- it didn't explode!"

21. In a deposition in 2006, then CEO and owner of Blitz, John C. Elmburg, testified he had asked Wal-Mart years before to support a national campaign to educate consumers about the potential dangers of misusing gas containers, and about how to use them properly. Wal-Mart refused.

22. Prior to the sale of the subject Blitz gas container, Wal-Mart and No.1 and No.2 were not only subjectively aware of the history/efficacy of flame arrestors, Wal-Mart and/or No.1 and No.2 undertook on their own to test flame arrestors in plastic

gas containers. They found them to be effective in preventing flames from entering the container and causing an explosion.

23. Prior to the sale of the subject Blitz gas container, Wal-Mart and No.1 and No.2 had actual, subjective knowledge that people used gas containers to pour gasoline as an ignition source for brush and debris piles. They also had actual subjective knowledge of the catastrophic injuries suffered by users of gas containers that were not equipped with effective flame arrestors. Wal-Mart and No.1 and No.2 also had actual subjective knowledge that the Consumer Product Safety Commission analyzed available incident and injury databases and determined that at least 11 deaths and 1,200 emergency room visits that involved gas container explosions during the pouring of gasoline since 1998.

24. Although Wal-Mart told Blitz and other gas container manufacturers to alter their gas container designs to prevent spout leaking, and although Blitz and the other gas container manufacturers complied with Wal-Mart's directives, Wal-Mart never asked Blitz or any other gas container manufacturer to add flame arrestors to their gas containers to prevent injuries and deaths. Nor did Wal-Mart pull gas containers that did not have flame arrestors from its shelves.

25. Instead, despite their actual subjective knowledge of this simple inexpensive safety device, the ability of this technology to stop a flame from entering gas can, and the catastrophic injuries that could be totally prevented, Wal-Mart and/or

No.1 and No.2 recklessly chose to endanger its customers and ultimate users of these gas containers by continuing to sell millions of gas containers without flame arrestors.

26. With the knowledge that plastic gas containers not equipped with flame arrestors were exploding, Wal-Mart sought on at least two occasions to significantly increase sales of these dangerous products to customers to decrease its product cost from Blitz as opposed to insisting on a fix to prevent its customers from suffering severe burn injuries or dying.

27. Wal-Mart sold more than 40 million Blitz gas containers without flame arrestors between 2002 to 2013.

28. The Blitz gas container at issue was bought at one of Wal-Mart's retail locations and/or from No.1 and No.2. As a family member of the purchaser, Jackson was a foreseeable user of the Blitz gas container to Wal-Mart and No.1 and No.2 at the time it was sold.

29. On November 9, 2011, Blitz sought relief under Chapter 11 of the United States Bankruptcy Code. Blitz's bankruptcy was caused, in part, by Blitz's failure to include a flame arrestor in its product, which led to grievous injuries suffered by users and/or consumers of Blitz Gas containers.

30. Contemporaneous with the filing of the Chapter 11 petition, Blitz filed a verified complaint for declaratory and injunctive relief, seeking to halt personal injury cases which were then pending against it. That verified complaint provided that Blitz

had been named in 35 pending gas container actions; and that "these plaintiffs have alleged that these explosions would be eliminated through the use of a metal flame arrestor."

31. In 2013, Wal-Mart voluntarily agreed to contribute about $25M towards a $161M settlement fund to compensate victims of burn injuries between July 2007 and July 2012 caused by Blitz gas containers that did not have flame arrestors. Since that time, the fund has run dry and the trust has dissolved. However, people are still being catastrophically hurt from Blitz gas containers that were sold by Wal-Mart and No.1 and No.2 that are still unwittingly being used by consumers and users all over the nation who have no knowledge of this very serious and latent defect.

32. On the evening of April 21, 2015, Jackson set out to burn a small pile of debris in the backyard of the property located at 108 Hunters Point Circle in Shelby County, Alabama.

33. Jackson had difficulty igniting the debris pile due to moisture and some of the wood in the pile being "green," so he grabbed the subject Blitz gas container and poured some gasoline onto the pile.

34. Jackson was not aware that the Blitz gas container did not contain a flame arrestor or that it could have been sold with such a device. Nor was Jackson aware of the need of a flame arrestor or that the Blitz gas container's vapor trail could ignite and cause a flashback explosion.

35. After setting the subject Blitz gas container aside, Jackson returned to the pile to ignite it. Despite several attempts, Jackson could only ignite a small section of the pile, so he grabbed the subject Blitz gas container and started splashing additional gasoline onto the pile.

36. As Jackson splashed additional gasoline onto the debris pile, the small section of burning debris suddenly caught the vapor trail from the subject Blitz gas container on fire. The ignited vapor trail quickly traveled back into the subject Blitz gas container, causing it to explode and shoot into the air, covering Jackson in burning gasoline.

37. Jackson ran away from the debris pile, engulfed in flames, and began rolling around in the backyard with the help of a neighbor who had pulled him to the ground.

38. Together, Jackson's neighbor and roommate worked to extinguish and/or remove burning clothes from Jackson's body. After the fire was out, Jackson's roommate took Jackson inside the house to wait for paramedics to arrive and transport him to the hospital.

39. Jackson suffered and/or continues to suffer severe personal injuries, including but not limited to second degree burns over 80% of his body, skin grafts, debridement procedures, infections, severe physical pain and suffering, permanent scarring, impairment and disfigurement, psychological impairment, and emotional

distress.

40. Jackson spent more than 280 days in UAB Hospital. Thus far, he has incurred more than $1,000,000.00 in medical bills, and he will continue to incur reasonable and necessary medical expenses in the future in an amount that is currently unknown, but will be disclosed when ascertained.

41. As a direct and proximate result of the explosion, Jackson has (1) suffered severe and permanent burn injuries and scarring and has lost significant aspects of the quality of his life, and he will suffer those injuries, scarring, and lost quality of life for the rest of his life, (2) suffered physical pain, mental suffering, and mental anguish, and he will suffer these maladies for the rest of his life, (3) lost income from being unable to work and he will lose future income and earning capacity for the rest of his life, and (4) incurred hospital, nursing, rehabilitation, and other medical expenses, and he will incur these expenses for the rest of his life.

42. Jackson is thirty-four years old.

## Causes of Action

### Count 1: Breach of the Implied Warranty of Merchantability.

43. Jackson incorporates the paragraphs above as if they were set forth herein.

44. Wal-Mart and No.1 and No.2 impliedly warranted that the Blitz gas container was reasonably fit and suitable for the purposes for which it was intended to be used, was free of defects, and was of merchantable quality. Wal-Mart and No.1

and No.2 breached said warranties because it was subject to explosion when being used for its ordinary and foreseeable purpose -- i.e. to pour gasoline. They also breached said warranties because the Blitz gas container was not reasonably fit or suitable for the purposes for which it was intended to be used, was not free of defects, and was not of merchantable quality.

45. At the time Jackson was burned, there was no change to the Blitz gas container from the time it left the possession of Wal-Mart and No.1 and No.2 until it reached Jackson, the ultimate user. To the contrary, the Blitz gas container was in substantially the same condition when Jackson used it as when the Blitz gas container left the possession of Wal-Mart and No.1 and No.2.

46. The breach of warranty by Wal-Mart and No.1 and No.2 was the direct and proximate cause of the injuries and damages of Jackson as set forth in paragraphs 39 thru 41 above. These injuries and damages would have been prevented if Wal-Mart and No.1 and No.2 had not breached their warranties.

47. These breach of warranty claims have been held to be outside the general prohibitions of the Alabama Innocent Seller Act because they fall under an exception to the Act. Robinson v. Invacare Corp., 2013 WL 5567084 (S.D. Ala. 2013)(Steele)(holding that claims against a seller for the breach of the implied warranty of merchantability is outside the prohibitions of the Innocent Seller Act, citing Ala. Code § 6-5-521(b)(4) ("It is the intent of this subsection to protect

distributors who are merely conduits of a product. This subsection is not intended to protect distributors from independent acts unrelated to ... warranty violations ... .").

WHEREFORE, PREMISES CONSIDERED, Jackson respectfully request this Honorable Court to enter judgment in his favor against Wal-Mart and No.1 and No.2 on a verdict rendered by a jury, to award him compensatory damages against Wal-Mart and No.1 and No.2 in an amount determined by a jury, and to award him court costs and any and all relief which is proper.

Count 2: Common Law Negligence.

48. Jackson incorporates the paragraphs above as if they were set forth herein.

49. Years before the subject Blitz gas container was sold, Wal-Mart and No.1 and No.2 and their employees undertook to determine whether gas containers without flame arrestors were safe to use by consumers. Wal-Mart and No.1 and No.2 and their employees conducted substantial research and conducted substantial testing on many different kinds of gas containers with and without flame arrestors and concluded that gas containers without flame arrestors were unsafe, defective, and unreasonably dangerous when the gas container was used for its intended purpose. Wal-Mart and No.1 and No.2 and their employees also had actual knowledge from having been a defendant in numerous suits that gas containers like the subject Blitz gas container that were sold without flame arrestors were defective, and unreasonably dangerous when the gas container was used for its intended purpose. Yet despite having this

actual knowledge, Wal-Mart and No.1 and No.2 and their employees continued to stock said gas containers on the shelves in their stores and sell them to their customers, knowing full well that they were unsafe, defective, and unreasonably dangerous when used for their intended purpose and that a substantial number of consumers and users would suffer the severe burn injuries like Jackson suffered in this case. In other words, Wal-Mart and No.1 and No.2 were not merely innocent distributers of defective products. Wal-Mart and No.1 and No.2 were complicit and involved distributers of defective products.

50. Wal-Mart and No.1 and No.2 also knew from its testing and other actual knowledge that the warnings accompanying said gas containers failed to adequately warn consumers and users of the defects stated above. First, Wal-Mart and No.1 and No.2 knew that the Blitz gas containers did not have proper warnings that they may explode if there was a flashback. Second, Wal-Mart and No.1 and No.2 knew that gas containers are likely to be passed on beyond the original consumer to other users and that paper stickers on gas containers would be saturated with gas, become unreadable, and/or be removed, all of which means that the warnings that were included would not likely reach all ultimate users.

51. In addition and in the alternative, Wal-Mart and No.1 and No.2 also undertook its own independent testing of gas containers, including the subject Blitz gas containers, to determine whether they are safe without flame arrestors. Wal-Mart

and No.1 and No.2 negligently performed those tests and/or negligently failed to respond in a reasonably prudent fashion to the results of the testing.

52. As a direct and proximate result of the negligence of Wal-Mart and No.1 and No.2, they negligently sold the subject Blitz gas container, and it was ultimately used by Jackson, who used the Blitz gas container in a way that was foreseeable to Wal-Mart and No.1 and No.2. The manner in which Jackson was injured was also foreseeable to Wal-Mart and No.1 and No.2.

53. At the time Jackson was burned, there was no unforeseeable substantial change to the Blitz gas container from the time it left the possession of Wal-Mart and No.1 and No.2 until it reached Jackson, the ultimate user. To the contrary, the Blitz gas container was in substantially the same condition when Jackson used it as when the Blitz gas container left the possession of Wal-Mart and No.1 and No.2.

54. All of the foregoing negligent conduct of Wal-Mart and No.1 and No.2 was the direct and proximate cause of the injuries and damages of Jackson as set forth in paragraphs 39 thru 41 above. These injuries and damages would have been prevented if Wal-Mart and No.1 and No.2 had acted with reasonable care.

55. Wal-Mart and No.1 and No.2 are vicariously liable for the torts committed by their employees in the course and scope of their employment under the doctrine of respondeat superior.

56. These negligence claims are outside the general prohibitions of the

Alabama Innocent Seller Act because they fall under the exceptions to the Act. Ala. Code § 6-5-521(b)(4) ("It is the intent of [the Act] to protect distributors who are merely conduits of a product. This subsection is not intended to protect distributors from independent acts unrelated to the product design or manufacture, such as independent acts of negligence ... .").

WHEREFORE, PREMISES CONSIDERED, Jackson respectfully request this Honorable Court to enter judgment in his favor against Wal-Mart and No.1 and No.2 on a verdict rendered by a jury, to award him compensatory damages against Wal-Mart and No.1 and No.2 in an amount determined by a jury, and to award him court costs and any and all relief which is proper.

Count 3: Common Law Wantonness.

57. Jackson incorporates the paragraphs above as if they were set forth herein.

58. By consciously doing (and not doing) the acts set-forth above, Wal-Mart and No.1 and No.2 and their employees knew that from doing the acts (or not doing the acts) that injury will likely or probably result to a substantial number of consumers and users. Simply put, despite the wealth of actual and subjective scientific knowledge -- including subjective actual knowledge that the Blitz gas containers were unsafe, defective, and unreasonably dangerous without a flame arrestor -- Wal-Mart and No.1 and No.2 and their employees made a conscious, willful, wanton and/or reckless decision to endanger the safety of consumers, users

and bystanders by selling Blitz gas containers even though they had actual subjective knowledge that they were not equipped with a technologically and economically feasible safety device that would product consumers and users against serous injury. Their conduct was intentional, wanton, reckless, malicious and oppressive.

59. All of the foregoing wrongful conduct of Wal-Mart and No.1 and No.2 was the direct and proximate cause of the injuries and damages of Jackson as set forth in paragraphs 39 thru 41 above. These injuries and damages could have been prevented if Wal-Mart and No.1 and No.2 had not acted with wantonness.

60. Wal-Mart and No.1 and No.2 are vicariously liable for the torts committed by their employees in the course and scope of their employment under the doctrine of respondeat superior.

61. These wantonness claims have been held to be outside the general prohibitions of the Alabama Innocent Seller Act because they fall under an exception to the Act. Barnes v. Gen. Motors, 2014 WL 2999188, *5 (N.D. Ala. 2014)(Kallon)("The decision to stock and sell a product that was known to be likely or probable to cause injury could constitute an independent act of wantonness that is separate from any act related to the design or manufacture of the product itself. That theory is that it is not the particular design flaw of the product that is the basis for the claim, but the decision of the defendant to sell a product (any product) it knows to be unreasonably dangerous")(quoting and following Lazenby v. ExMark Mfg., 2012 WL

3231331, *3 (M.D. Ala. 2012)(Watkins)(following Ala. Code § 6-5-521(b)(4) ("It is the intent of this subsection to protect distributors who are merely conduits of a product. This subsection is not intended to protect distributors from independent acts unrelated to the product design or manufacture, such as independent acts of ... wantonness ... ."))).

WHEREFORE, PREMISES CONSIDERED, Jackson respectfully request this Honorable Court to enter judgment in his favor against Wal-Mart and No.1 and No.2 on a verdict rendered by a jury, to award him compensatory and punitive damages against Wal-Mart and No.1 and No.2 in an amount determined by a jury, and to award him court costs and any and all relief which is proper.

Count 4: Common Law AEMLD.

62. Jackson incorporates the paragraphs above as if they were set forth herein.

63. Upon information and belief, Wal-Mart and No.1 and No.2 and their employees had substantial control over the design, manufacture, assembly, testing, inspecting, marketing, distributing, and/or selling of the Blitz gas containers for use by the general public.

64. The Blitz gas container was not reasonably safe when used in a foreseeable manner. To the contrary, it was in a defective and unreasonably dangerous condition to the human body when being so used for the reasons stated above.

65. Jackson used the Blitz gas container in a way that was foreseeable to Wal-

Mart and No.1 and No.2. The manner in which Jackson was injured was also foreseeable to Wal-Mart and No.1 and No.2.

66. At the time that the Blitz gas container was sold, there were safer alternative designs that would have alleviated the defects stated above and would have prevented the risk of injury without substantially impairing the Blitz gas container's utility. Most prominently, the incorporation of a flame arrestor into the product would have alleviated the risk of harm. This and other safer alternative designs were economically and technologically feasible at the time the Blitz gas container left the control of Wal-Mart and No.1 and No.2 by the application of existing or reasonably achievable scientific knowledge and/or plain common sense.

67. At the time Jackson was burned, there was no unforeseeable substantial change to the Blitz gas container from the time it left the possession of Wal-Mart and No.1 and No.2 until it reached Jackson, the ultimate user. To the contrary, the Blitz gas container was in substantially the same condition when Jackson used it as when the Blitz gas container left the possession of Wal-Mart and No.1 and No.2.

68. Upon information and belief, Wal-Mart and No.1 and No.2 and their employees had substantial control over the warnings and instructions accompanying the Blitz gas container also rendered the Blitz gas container. Those warnings and instructions were also defective and unreasonably dangerous for the reasons stated above.

69. The defective and unreasonable dangerous condition of the Blitz gas container was the direct and proximate cause of the injuries and damages of Jackson as set forth in paragraphs 39 thru 41 above. These injuries and damages would have been prevented if the Blitz gas container had not been defective and unreasonably dangerous.

70. These AEMLD claims are outside the general prohibitions of the Alabama Innocent Seller Act and to fall under the exceptions to the Act. See Ala. Code § 6-5-521(b)(2) (the prohibitions under the Act do not apply when "[t]he distributor exercised substantial control over the design, testing, manufacture, packaging, or labeling of the product and such act is causally related to the product's condition").

WHEREFORE, PREMISES CONSIDERED, Jackson respectfully request this Honorable Court to enter judgment in his favor against Wal-Mart and No.1 and No.2 on a verdict rendered by a jury, to award him compensatory damages against Wal-Mart and No.1 and No.2 in an amount determined by a jury, and to award him court costs and any and all relief which is proper.

<u>Jury Demand</u>

71. Jackson requests a trial by struck jury on all factual issues and claims.

Respectfully submitted,

 /s/ Richard Riley
Rip Andrews (ASB-8868-L52A)
Richard Riley (ASB-6483-Y87R)
Jane Mauzy (ASB-6721-N56M)
Attorneys for Charles Jackson

OF COUNSEL:
MARSH, RICKARD & BRYAN P.C.
800 Shades Creek Parkway; Suite 600-D
Birmingham, Alabama 35209
Ph:   (205)879-1981
Em:   ripandrews@mrblaw.com
       rriley@mrblaw.com
       jmauzy@mrblaw.com

Request for Service

Plaintiff Charles Jackson requests that the Clerk immediately issue a summons
pursuant to F.R.C.P. 4(e)(1) and A.R.C.P. 4(i)(2) for the following defendants to be
served at the following address by certified mail at the following address:

WAL-MART STORES INC.
c/o C.T. Corporation System, its registered agent
2 North Jackson Street, Suite 605
Montgomery, Alabama 36104

WAL-MART STORES EAST L.P.
c/o C.T. Corporation System, its registered agent
2 North Jackson Street, Suite 605
Montgomery, Alabama 36104

 /s/ Richard Riley
Richard Riley

-21-